IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN HONEY PRODUCERS ASSOCIATION, INC., an Oklahoma corporation, et al. | CASE NO. CV-F-05-1619 LJO |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| THE UNITED STATE DEPARTMENT OF AGRICULTURE, | |
| Defendant.                                     / | |

**I. INTRODUCTION**

The issue in these cross motions for summary judgment is whether the advertisements by the Honey Board, made pursuant to the Honey Act, 7 U.S.C. §§ 4601-4613, are impermissibly compelled speech in violation of the honey producers' First Amendment rights or whether the advertisements constitute "government speech," which survives First Amendment scrutiny. For support, or by way of distinction, each party points to the United States Supreme Court case of *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005) ("*Livestock Marketing*"). Having read and reviewed the arguments, including the additional briefing the Court had requested on several issues, administrative record, and the various cases on this legal issue, the Court finds that Defendants' motion for summary judgment is

properly to be GRANTED and Plaintiffs' motion for summary judgment should properly be DENIED.

## II. BACKGROUND

### A. Procedural History

Plaintiffs, The American Honey Producers Association, Inc., an Oklahoma corporation, and nine individual honey producers, all of whom are voluntary members of The American Honey Producers, Association, Inc. ("The American Honey Producers"), are required to have assessments deducted from them by their respective handlers. These assessments support the Honey Research, Promotion and Consumer Information Act, 7 U.S.C.§ 4601 *et seq*. ("the Honey Act"). A substantial amount of those assessments are used by the National Honey Board to engaged in speech related activities like promotion, marketing, consumer education, advertising, trade negotiations, and government relations. The American Honey Procedures contend that the compelled assessments violate their free speech and free association rights under the United States Constitution.

On September 28, 2001, The American Honey Producers brought an administrative petition pursuant to 7 USC §4609 contending that the Honey Act as written and applied violated their First Amendment rights. Plaintiffs sought exemption from the assessments and a refund of previously paid assessments. A hearing ensued, after which the Administrative Law Judge ("ALJ") found that the Honey Program was "government speech" in accordance with *Livestock Marketing*. Plaintiffs appealed that judgement to a Judicial Officer ("JO") of the USDA. On November 28, 2005, the JO affirmed the ALJ's decision. Plaintiffs then filed a complaint before this Court pursuant to 7 U.S.C §4609 against Defendant, United States Department of Agriculture ("USDA"). It is undisputed that The American Honey Producers have exhausted administrative remedies. The parties have agreed that cross motions for summary judgment based upon the administrative record are the appropriate proceedings before this Court .

### B. The Honey Act[1]

In 1986, Congress passed the Honey Act, 7 U.S.C. §§4601-4613. The Honey Act established the

---

[1] These facts are based on the Joint Statement of Undisputed Material Facts submitted by the parties on April 24, 2007 (Doc. 36).

Honey Board, which, under the supervision of the Secretary of Agriculture, administers the program mandated by Congress. 7 U.S.C. §4606. The Honey Board consists of seven honey producers (at least 50 per cent of the National Honey Board are producers), two honey handlers, two honey importers, and one officer, director or employee of a national honey marketing cooperative. 7 U.S.C. 4606. The Honey Board's goal is to increase the demand for honey. To achieve this goal, the Honey Board promotes honey as a desirable product. 7 U.S.C. §4601. To that end, the Honey Board initiates budgets, marketing ideas, and program ideas. (Tr. 330-31, 607-08).[2]

The Honey Board is funded through assessments paid by honey producers and honey importers. 7 U.S.C. 4606(e). Initially, payment of assessments was voluntary. Thereafter, payment of assessments became mandatory. (Tr. 66, 107). Assessments are exacted by collecting from honey producers $0.01 for each pound of honey produced in the United States and by collecting from honey importers $.01 for each pound of honey or honey products imported into the United States. 7 U.S.C. 4606(e). First handlers, bottlers, or others who place honey in commerce, collect assessments on honey produced in the United States by deducting the assessments from the amount paid to the honey producers. These first handlers then forward the assessments to the National Honey Board. (Tr. 22)

The Honey Board itself is not a government entity, but it is supervised by the Secretary of Agriculture, and on behalf of the Secretary, by personnel of the USDA, specifically by the Chief of the Research and Promotion Branch for Fruits and Vegetables, Agricultural Marketing Service("AMS"), Martha B. Ransom, and her staff. (Tr. 330-33, 424-29). All Honey Board budgets, contracts, and projects are submitted to the USDA for review and approval (RX 1-RX 52; Tr. 330-33, 425-29), but the Honey Board pays for the USDA's oversight. (Tr. 353). The Honey Board staff are not government employees and their salaries are not set by the USDA. (Tr. 187, 346, 573-75). The property of the Honey Board is not government property. (Tr. 578).

The Secretary of Agriculture appoints each member of the Honey Board, in accordance with the specific directions contained in the Honey Research, Promotion, and Consumer Information Act, from

---

[2] The Honey Research, Promotion and Consumer Information Order, promulgated by the United States Department of Agriculture ("USDA") also outlines the creation and the functioning of the Honey Board. See XX C.F.R. 12401 et seq.

3

nominees proposed by the National Honey Nominations Committee. 7 U.S.C. §4606. The National Honey Nominations Committee is appointed by the Secretary of Agriculture from nominees proposed by state beekeeper associations. *Id.*

The USDA's oversight and control of the Honey Board includes acting as supervisor to the Honey Board during the development of promotion, research, education, and information activities. (RX 1-RX 52; Tr. 427, 463-529). A representative of the USDA attends each meeting of the Honey Board as an active participant, providing comments or feedback to the Board (Tr. 427).[3] The USDA retains final approval authority over every assessment dollar spent by the Board. (Tr. 427, 432-34). The USDA's review and approval of projects include evaluation in accordance with USDA policy, AMS guidelines, Federal Trade Commission ("FTC") advertising laws and regulations, and Food and Drug Administration ("FDA") labeling requirements. (RX 60; Tr. 429).

### III. Standards of Review

**A.     Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir. 1985); *Loeh v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). A genuine issue of material fact exists when "...there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Facts are material when so rendered by the applicable substantive law. Id. at 248. Thus, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catarett*, 477 U.S. 317, 322. "[A]

---

[3] While the American Honey Producers argue that a representative did not attend every meeting as an active participant in their motion for summary judgment, they provide no contradictory evidence and signed the statement of undisputed facts which asserts this to be true.

4

complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and, in such circumstances, summary judgment should be granted "...so long as whatever is before the...court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

Under summary judgment practice, the moving party:

[A]lways bears the initial responsibility of informing the...court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* If the moving party in such cases meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue actually exists as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 455 U.S. 951 (1980).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c); *Poller,* 368 U.S. at 468; *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305-1306 (9th Cir. 1982). The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir. 1978). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielson Freight Lines*, 602 F. Supp. 1224, 1244-1245 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, or admissible discovery material, in support of its contention that the dispute exists. Fed. R.

5

Civ. P. 56(e); *Matsushita*, 475 U.S. at 586, fn. 11; *First Nat'l Bank*, 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material (i.e., a fact that might affect the outcome of the suit under the governing law).  *Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The opposing party must also show that the dispute is genuine (i.e., that the evidence is such that a reasonable jury could return a verdict for the non-moving party).  *Anderson,* 477 U.S. at 248-249; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "...the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290; *T.W. Elec. Serv.*, 809 F.2d at 631.  However, to demonstrate a genuine issue, the opposing party "...must do more than simply show that there is some metaphysical doubt as to the material facts... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (citations omitted).  Thus, the "...purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

**B.      District Court's Review of the Decisions of the agency decision**

The jurisdiction of this court to review the agency decisions derives from the Honey Act.  U.S.C. §4609(b) of the Honey Act holds:

> The district courts of the United States in any district in which such person is an inhabitant, or carries on business, are hereby vested with jurisdiction to review such ruling [of the administrative process], provided a complaint for the is filed within twenty days from the date of the entry of such ruling....If the court determines that such a ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) *to make such ruling as the court shall determine to be in accordance with the law*, or (2) *to take such further proceedings as, in its opinion, the law requires* (emphasis added).

The language of 7 U.S.C. §4609(b) of the Honey Act is virtually identical to 7 U.S.C. §608c(15)(B) of the Agricultural Marketing Agreement Act ("AMAA").  The Ninth Circuit in *Wileman Bros. & Elliot,*

6

*Inc., et al v. Espy*, 58 F.3d 1367 (9th Cir. 1995) (reversed on other grounds in *Glickman v. Wileman Bros. & Elliot, Inc., et al*, 521 U.S. 457 (1997) reviewed a USDA decision under 7 U.S.C. §608c(15)(B) with respect to claims against assessments imposed for peaches, nectarines, and plums.  The Ninth Circuit analyzed the agency's decision under 5 U.S.C. §706(2)(A) as to whether the agency's decision was arbitrary and capricious under the "substantial evidence" test.[4]

"Under the substantial evidence test, we consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the agency's decision." 58 F.3d 1374-75.  The Ninth Circuit also noted in *Wileman* that the Administrative Law Judge's decisions are treated as part of the record, and when the agency and the "ALJ disagree, as they have in this case, we may give less deference to the agency's findings than they would otherwise receive." 58 F.3d 1375, n.4.

Prior to *Wileman*, the Ninth Circuit also reviewed *Cal-Almond, Inc., et al v. USDA*, 14 F.3d 429 (9th Cir. 1993).  In that case, the standard of review was de novo, because the district court's (REC) decision followed cross-motions for summary judgment based upon the administrative record.  14 F.3d 430.  Under the APA, 5 U.S.C. §706(2), the court must analyze whether the agency's actions are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *Wileman Bros.*, "When the arbitrary and capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the

---

[4] 5 U.S.C. 706 holds: This statute provides:

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

substantial evidence test." *Id.* "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.*

Therefore, since this case is based on cross-motions for summary judgment on an agency review, this Court will review such agency decision on the basis of whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law standard. The agency decision has to be based upon "substantial evidence" and if it is not substantial, then the Court has to rule in favor of the non-moving party.[5]

### IV. GOVERNMENT SPEECH DOCTRINE AND AGRICULTURAL COMMODITY MARKETING ACTS

#### A. Introduction

"The government-speech doctrine is relatively new, and correspondingly imprecise." *Livestock Marketing*, 125 S.Ct. 2055, 2070 (Souter, dissenting). On the issue, the Ninth Circuit has predicted, "Constitutional law classes will doubtless enjoy the superficially droll question, 'why does the Constitution prohibit the government from compelling mushroom growers, but allow government to compel nectarine, peach and plum growers, to pay for generic advertising?'" *Delano Farms Co. vs. California Table Grape Commission*, 318 F.3d 895, 898 (9th Cir. 2003). The Court concluded, "Doubtless many cases will arise that are hard to place on one side or the other of the *Glickman-United Fruit* distinction." *Id.*

The current question is made even more "droll" with the *Livestock Marketing* opinion, which decides the beef case on a third theory. As Justice Scalia noted in the opening line of *Livestock Marketing*, "For the third time in eight years, we consider whether a federal program that finances generic advertising to promote an agricultural product violates the First Amendment." The dispositive question in *Livestock Marketing* is the same as that presented before this Court; namely, whether the generic advertising at issue is the Government's own speech and therefore is exempt from First Amendment scrutiny.

---

[5] After supplemental briefing on the issue of standard of review, both parties agree this is the appropriate standard. See Pl. Response to Court's "Order for Additional Briefing," 1-3 (Doc. 32) ("Pl. Response"); Def. Response to Court's "Order for Additional Briefing," 1-2 (Doc. 34) (Def. Response").

**B.     Prior to *Livestock Marketing***

To understand the ruling of *Livestock Marketing* more clearly, a brief discussion of the preceding cases are warranted. In 1997, growers, handlers and processors of California tree fruits challenged a requirement to finance generic advertising under the Agricultural Marketing Agreement Act of 1937 ("AMA") (7 USC 601 et seq) as "abridging the freedom of speech within the meaning of the First Amendment." *Glickman v. Wileman*, 521 U.S. 457, 457 (1997). In *Glickman*, the Supreme Court reasoned:

> In answering [the question of whether the AMA abridges freedom of speech] we stress the importance of the statutory context in which it arises. California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by their regulatory scheme. It is in this context that we consider whether we should review the assessments used to fun collective advertising, together with other collective activities, under the standard appropriate for the review of economic regulation or under a heightened standard appropriate for the review of First Amendment issues. 521 U.S. 457, 469.

Ultimately, the Court found that "generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme....what we are reviewing is a species of **economic regulation** that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." 521 U.S. 457, 477. (emphasis added). Accordingly, the assessments were upheld as Constitutional.

After *Glickman*, the Supreme Court was again presented with a challenge of required marketing subsidies in *United States v. United Foods*, 533 U.S. 405 (2001). Recognizing that "[f]our terms ago, in *Glickman*, [we] rejected a First Amendment challenge to the constitutionality of a series of agricultural marketing orders that, as part of a larger regulatory scheme," the Court distinguished the case because "the features of the marketing scheme found in *Glickman*" were not present in *United Foods*." 533 U.S. 405, 411. Unlike the AMA, which was designed to control the markets and had speech as an ancillary issue, the "statutory mechanism as it relates to handlers of mushrooms is concededly different from the scheme in *Glickman*; here the statute does not require group action, save

to generate the very speech to which some handlers object." *Id.*

In *United Foods,* the Supreme Court did offer in dicta some concerns about the "government speech" issue currently before this Court

> The Government's failure to raise its argument in the Court of Appeals deprived respondent of the ability to address significant matters that might have been difficult points for the Government. For example, although the Government asserts that advertising subject to approval by the Secretary of Agriculture, respondent claims the approval is pro forma. This and other difficult questions would have to be addressed were the program to be labeled, and sustained, as government speech." *Id* at 417.

Identifying its concern with the argument of government speech in this context, the Court reserved judgment on the issue, until *Livestock Marketing*.

**C.**     ***Livestock Marketing***

In *Livestock Marketing*, the Court described the Beef Promotional Act, noting that the Department of Agriculture oversees similar programs of promotional advertising, funded by checkoffs, for a number of agricultural commodities. 125 S.Ct. 2055, 2060, n.2 (citing programs for cotton, potatoes, watermelons, peanuts, blueberries, hass avocados, soybeans, pork, **honey**, eggs, and lamb) (emphasis added). The Court further noted that it has "generally assumed, but not yet squarely held, that compelled funding of government speech does not alone raise First Amendment concerns." *Id.*

In considering whether the compelled subsides were government speech, the Court understood that the "Secretary of Agriculture does not write ad copy himself." *Id.* at 560. Rather, the Beef Boards's promotional campaigns are designed by the Beef Board's Operating Committee, only half of whose members are Beef Board members appointed by the Secretary. All members are subject to removal by the Secretary. *Id.* All of the Beef Board's members are appointed by the Secretary, pursuant to law. *Id.*

The Court also places great importance on the federal government controlling the message of the advertisements. "The message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* at 560. The "message set out in the beef promotions is from beginning to end the message established by the Federal government." *Id.* For this assertion, the Court looks at the statute, which provides that Congress directed the implementation of a "coordinated program" of promotion, "including paid advertising, to advance the image and desirability of beef and beef products."

*Id*. at 561.   In the Beef Promotional Act, Congress further specified, and the Court pointed to, what the promotional campaigns shall contain (taking into account different types of beef products) and what they shall not taken into account (shall not refer to a brand or trade name of any beef product).

Furthermore, the Secretary exercised final approval authority over every word used in every promotional campaign.  All proposed promotional messages were reviewed by department officials both for substance and wording, and some proposals were rejected or rewritten by the department." *Id* at 561.   Additionally, the "Secretary of Agriculture, a  politically accountable official, oversaw the program, appointed and dismissed the key personnel and retained absolute veto power over the advertisement's content, right down to the wording."    Finally, "the secretary's role was not limited to final approval or rejection: officials of the Department also attended and participated in the open meetings at which proposals were developed." *Id.* Therefore, the challenged subsidies comprise government speech because Congress and the Secretary have set out the overarching message and some of its elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary.

**D.    Since Livestock Marketing**

Since *Livestock Marketing*, courts around the United States have considered and upheld similar agricultural products marketing acts.  In *Dixon v. Johanns*, No CV-05-03740-PHX-NVW (Dist. Ariz. 2006) , the court upheld assessments imposed pursuant to a Watermelon Research and Promotion Act. In *Avacoados Plus, Inc. v. Johanns*, Civil Action NO. 02-1789, the U.S.District Court for the District of Columbia upheld the constitutionality of the hass avocado act.  In *Cricket Hosiery v. United States*, 429 F.Supp. 1338 (U.S. Ct. Int'l Trade 2006), the court upheld the constitutionality of a Cotton Act.  In *Cochran v. Veneman*, 3rd Cir. 2005, the Court upheld assessments for the National Dairy Promotion Board. In sum, all of these cases, which challenge statutory provisions similar to the Honey Act, have been upheld under the government speech doctrine.

**V. ANALYSIS**

**A.  *Livestock Marketing* is applicable**

The American Honey Producers argue that the USDA, ALJ, and JO sought "refuge in the

11

government speech doctrine," but that this claim "tortures" the Court's decision in *Livestock Marketing*. Pl. MSJ, 19. The American Honey Producers seek to distinguish *Livestock Marketing* in several ways. First, they argue that Congress did not prescribe the basic message to be used by the Honey Board, as it did in the statute for the Beef industry. Second, the American Honey Producers assert that "no proposals have ever been rejected or rewritten. The approval is simply a negative check for compliance, not participation in the basic message." Third, the Honey Board can appeal to the "functional committee" if they disagree with the USDA. The functional committee resolves disputes. Thus, the USDA does not have the "final" authority. Fourth, while a USDA official may attend every Honey Board meeting, it offers no advice nor creative input into the Honey Board's messages. The "heavy involvement" is simply not present here.

In sum, the American Honey Board argues that USDA limits itself to a review to make sure the Honey Board's message is not disparaging to any other product, it is not false or misleading, is in good taste, and makes no unwarranted representations. It does not examine the efficacy of the promotional messages that are supposed to be its own message; instead, it totally defers to the Honey Board (private competitors) to determine how much they want to spend on research, promotion, or not spend on any of those categories, and the evidence shows that the USDA personnel are "potted plants" at the meetings and only review the Honey Board's project to ensure the messages are consistent with legislation.

The American Honey Producers illustrate their position by way of analogy. For example, the State Bar of California may prohibit certain forms of attorney advertising, when the State Bar advises that an attorney cannot advertise certain things, cannot say certain things, cannot send certain messages, one would not equate that "oversight" or "control" to be a State Bar message. Also, for example, the FCC has veto power over advertisements or broadcasts, but a business' advertisements do not become "government speech" just because the government entity reviews the content of the message to ensure it is not false or misleading. This is the relationship between the USDA and the Honey Board. The Honey Board promotes its own message, while the USDA simply checks for compliance similar to the State Bar and the FCC. Therefore, the message is not government speech.

In invoking this analogy to the State Bar of California, the American Honey Producers compare their issue with that decided in *Keller v. State Bar of California,* 496 U.S. 1 (1990). In making this

argument, the American Honey Producers concurrently admit that the Supreme Court has already considered and rejected this argument.

> [*Livestock Marketing*] explained why it did not follow *Keller*[], based specifically on the fact of the lack of 'government control' over the message. To Plaintiffs, that is the only issue before this Court, and the only cases of relevance. If the program, as applied, does not have such paternalistic oversight and control by USDA, it is not government speech, and thus unconstitutional. Pl. Response, 5.

The Court finds that fully *Livestock Marketing* is applicable in this case. The congressional act considered is nearly identical to the Honey Act. Further, the sole issue of whether the compelled subsidies are government speech was considered and settled. There is no question that *Livestock Marketing* controls this case.[6]

**B.    The Messages of the Honey Board are "government speech" which survives First Amendment Scrutiny**

The evidence in the administrative record substantially supports the conclusions of both the Administrative Law Judge and the Judicial Officer. A review of the administration record clearly establishes that those factors which controlled the decision in *Livestock Marketing* are present in this case. Martha Ransom ("Ms. Ransom"), chief of the Research and Promotion Branch for Fruits and Vegetables, Agricultural Marketing Service, testified that she supervises a staff of six persons who oversee several national promotion boards, including the Honey Board. She gave a detailed description of the extent of the Secretary of Agriculture's supervision. (Tab 49, pg. 427-571)[7] Ms. Ransom's testimony was bolstered by several key pieces of evidence, including letters, emails, operating manuals, guidelines, proposed brochures and marketing materials. Considering this evidence in light of the Honey Act and *Livestock Marketing*, there is no error in the ruling that the advertisements by the Honey Board

---

[6] The Supreme Court left open the possibility of an exception to this rule in Livestock Marketing. 544 U.S. at 566-66. The American Honey Producers do not argue this exception and it will not be discussed in this opinion.

[7] USDA offers little assistance to this Court by continuously citing to a record of almost 150 pages to summarily support large statements. This type of citation is not only unhelpful to this Court, but also in violation of our Local Rule 56-260(a), which requires a party in a motion for summary judgement to "cite the particular portion of any...document relied upon to establish that fact."(emphasis added)

13

are government speech.

The USDA controls from beginning to end the message of the Honey Board. In the beginning, Congress outlines the type of content that may be permissibly included in any promotional messages created pursuant to it. 7 U.S.C. §4601(b)(1) coordinates a program designed to

> (A) strengthen the position of the honey industry in the marketplace; (B) maintain, develop, and expand domestic and foreign markets and uses for honey and honey products; ( C ) maintain and improve the competitiveness and efficiency of the honey industry; and (D) sponsor research to develop better means of dealing with pest and disease problems.

This provision is similar to those of the Beef Act, 7 U.S.C. §2904(4)(B) and the Mushroom Act, 7 U.S.C. §6101(b)(1). To put forward this message, the Honey Board was established by the Honey Act and is made up of a group of people appointed by the Secretary of Agriculture in a way almost identical to the Beef Board. (*supra*; See also, "Congress set up each of the Acts almost identically, with each of the Boards being appointed by the Secretary..." Pl. Response, 4). Finally, all messages created pursuant to the Honey Act are subject to direct government oversight by the Secretary of Agriculture. See §1240.39(a)(1)-(8). *Compare* USDA oversight of Mushroom Board, §1209.40(a)(1), (2)(b)-(d). Through the Honey Act, Congress provided for the USDA to exercise, and the USDA does exercise, close control over the messages that the Honey Board disseminates through the honey promotion program.

In addition to prescribing the overall message that the Board is to disseminate, the Act limits the scope of the Boards's speech by prohibiting it from making false or unwarranted claims and prohibiting the use of funds to influence government action or policy. The Act provides for the Secretary to control the Board's membership. 7 U.S.C.§ 4606 (c)(1). It also gives the Secretary control over the Board's budget, plans, contracts, agreements, and projects before they may be implemented. 7 U.S.C. 4606(d)(I); Accord Order, 7 C.F.R. §§1240.39(a)(4), 1240.60, 1240.30, 1240.61, 1240.39, 1240.40(b). These provisions are substantially similar to those found in the Beef Promotion Act, 7 USC § 2902 *et seq*.

The undisputed evidence in the record contradicts the American Honey Producers' contention at the USDA oversight of the message is "pro forma" only and that the degree and oversight by the USDA distinguishes the Honey Act from the Beef Act considered in *Livestock Marketing*. In fact, the testimony and evidence substantially supports the finding that the USDA maintains a high degree of

oversight over the messages disseminated by the Honey Board and all promotional programs or other materials prepared or approved by the Honey Board.[8]  Letters are provided showing that the USDA actively advises the Honey Board in the development and promotion, research, and information activities and retains final approval authority over every assessment dollar the Board spends.  See e.g. RX 24, (approving four contracts after USDA editing, identifying issues in a public service announcement and not approving, admonishing the Honey Board for having released a claim without prior approval, reminding the Honey Board of its oversight function) and RX 25 ("the display must be revised and resubmitted before it can be used.")

The uncontradicted evidence further shows that Ms. Ransom or a member of her staff actively participates in every Honey Board meeting.  Promotional projects are discussed at these meetings and she or a member of her staff provides comments and feedback to the Honey Board.  Before a project approved by the Honey Board may be implemented, a formal written request must be submitted to the USDA and a member of Ransom's staff reviews and consults with Ransom.  Only after the Board makes the necessary changes to satisfy any concerns of USDA will the USDA grant final approval for implementation of the project.  AMS reviews and approves both the content and the USDA reviews and approves any material that the Honey Board prepares for use.  That review and approval is done in accordance with USDA policy, AMS guidelines, FTC advertising laws and regulations and the FDA's labeling requirements.  The USDA even controls the purse, with final approval authority over all contracts and the Honey Board's budget.

While the American Honey Producers claim that the degree of oversight by the USDA is insignificant, they have offered no evidence to support that claim.  The facts upon which the American Honey Producers rely do not contradict the findings of the Judicial Officer, nor do they support the theory that the compelled subsidies violate the Constitution.  While it may be true that the Honey Board members and staff are not "government employees" and the property owned by the Honey Board is not government property, the American Honey Producers mischaracterize the evidence presented and misunderstand the ruling of *Livestock Marketing*.

---

[8] Citations to these facts are contained in the background section of this Order, *infra*.

The Supreme Court was clear that government speech does not necessarily require that the Secretary of Agriculture personally writes the advertisements. Instead, it is the effective control the government has of the message from beginning to end. The evidence in this case substantially and overwhelmingly makes clear that the ruling by the ALJ and JO were in accordance with the law. Accordingly, those decisions were not arbitrary or capricious. The compelled subsidies fund government speech which is survives First Amendment scrutiny.

## VI. Conclusion

For the foregoing reasons, the Court orders:

I.   The American Honey Producers motion for summary judgment is DENIED;

II.  The USDA's motion for summary judgment is GRANTED; and

III. The motion hearing currently set for May 14, 2007 is VACATED.

**IT IS SO ORDERED.**

**Dated:   May 8, 2007**                         /s/ Lawrence J. O'Neill
                                                 **UNITED STATES DISTRICT JUDGE**